IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TAX TRACK SYSTEMS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.    01 C 6217 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| NEW INVESTOR WORLD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tax Track Systems Corporation ("Tax Track") has filed a four-count second amended complaint against defendant New Investor World, Inc. ("NIW"), alleging: (1) breach of a confidentiality agreement (Count I); (2) tortious interference with prospective economic advantage (Count II); (3) common law misappropriation (Count III); and (4) quantum meruit (Count IV). Pursuant to Fed. R. Civ. P. 56, defendant has moved for summary judgment on all counts of plaintiff's second amended complaint. Defendant has filed a two-count counterclaim against plaintiff, asserting breach of contract (Count I) and fraudulent misrepresentation (Count II). Pursuant to Fed. R. Civ. P. 56, plaintiff has moved for summary judgment on defendant's counterclaims.

For the reasons discussed herein, defendant's motion for summary judgment is granted as to all counts of plaintiff's second amended complaint, and plaintiff's motion for summary judgment is granted as to all counts of defendant's counterclaim.

## FACTS[1]

William Gray ("Gray") is a life insurance broker who owns plaintiff Tax Track, a Minnesota corporation with its principal place of business in Minneapolis. Defendant NIW is a Texas corporation, with its principal place of business in Dallas. Grace Barnard Krueger ("Krueger") is the president of defendant, which was incorporated in October 2000. The parties agree that the court has jurisdiction based on diversity of citizenship and an amount in controversy exceeding $75,000, pursuant to 28 U.S.C. § 1332(a)(1), and pendant jurisdiction over plaintiff's state law claims.

Plaintiff and defendant are competitors in the marketing of life insurance to high-net worth individuals where the purchase is accomplished through a loan from a financial institution. This insurance product or concept is sometimes referred to as "financed" or "premium financed" life insurance. Financed life insurance may be advantageous to wealthy clients because it allows them to prepare for estate tax obligations without incurring large out-of-pocket expenses for annual premiums and without incurring gift taxes. Typically, the insurance policy is held in a trust set up by the client and the bank loan is collateralized by assets owned by the client. At the policyholder's death the bank loan and any accrued interest is repaid from the death benefit with the remainder available for payment of estate taxes or distribution to heirs. A bank's agreement to defer the interest payments on the loans for many years is an essential component of the financed life insurance concept. Plaintiff alleges that it developed "an estate planning technique

---

[1]Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 statements and attached exhibits, are not in dispute.

and process for financing the purchase of life insurance in the least invasive and most tax-efficient manner," which plaintiff calls "Leveraged Life Insurance."

Krueger states that she was aware of the concept of financed life insurance prior to 1999, but did not actively market it. In July 1999, David Greene ("Greene"), who was then a registered representative with an insurance broker/dealer, came to a sales meeting of representatives of Northstar, Inc. ("Northstar"), a broker/dealer. At that time, Krueger was a vice president of Northstar, and attended the meeting with Greene. During the meeting Greene told Krueger that he wanted to be introduced to wealthy clients or prospective clients of Northstar so that he could attempt to sell financed life insurance products as an estate planning tool. Krueger and Greene agreed to work together, and they agreed to split any net commissions generated from the sale of financed life insurance sold through their joint efforts. Krueger understood that 20% of the gross commissions earned would be paid to Gray, who Krueger was told had arrangements with financial institutions that would issue the loans to finance the premium payments and accrued interest needed for the financed life insurance policies. From about July 1999 through early 2000, Greene made presentations to approximately 10 to 20 prospective clients to whom he was introduced by Krueger. During the presentations, Greene often used a power point presentation called "The Three Bears," which outlined the concepts and benefits of financed life insurance. Krueger did not sign a confidentiality agreement with Greene or Gray. Greene testified that he did not ask prospective clients to sign a confidentiality agreement prior to receiving information about financed life insurance.

After defendant was incorporated in October 2000, plaintiff and defendant entered into a confidentiality, intellectual property and non-disclosure agreement dated December 30, 2000

3

("Agreement"). The Agreement granted defendant access to and rights to use as a licensee certain confidential and proprietary information, business methods and practices developed by plaintiff, which was referred to as "Licensed Material." The Agreement states that Licensed Material "shall mean any and all information listed in Schedule A, appended hereto, and any additional material developed over the course of this Agreement to facilitate the concept of Leveraged Life Insurance and the Licensed Material." Paragraph 11 of the Agreement, titled "Governing Law," states that the "Agreement shall be construed in accordance with the laws of the State of Illinois." Prior to December 2000, neither Krueger nor defendant had a confidentiality agreement with Gray or plaintiff.

Between December 2000 and April 4, 2001, defendant submitted applications to Gray for policies that had underwriting approval from Western Reserve Life ("WRL"), an insurance company. It was defendant's understanding that plaintiff was submitting these applications to lenders. During this period, no cases closed; that is, no financed life insurance policies were issued on the applications submitted by defendant. According to defendant, during the first three months of the Agreement, Gray failed to demonstrate or provide evidence that plaintiff had banks in place that would issue the necessary loans to allow interest to accrue for a period of more than one year, as required for financed life insurance. Defendant also claims that during the first three months of the Agreement it learned that Gray was taking applications submitted to him to carriers other than WRL. Defendant asserts that if these applications were accepted by carriers other than WRL, defendant would not receive a commission. Defendant asserts that it also discovered that contrary to its prior understanding, Gray was not a licensed attorney.

The Agreement provides that the obligations of either party regarding the treatment of confidential information and the Licensed Material survive termination of the Agreement, and that any such material shall be returned to the originating party or destroyed. On April 4, 2001, defendant wrote a letter to plaintiff terminating the Agreement pursuant to paragraph 6 of the Agreement, which provides that either party may terminate the Agreement with or without cause upon 90 days notice. In its termination letter, defendant states it will return all proprietary information provided by plaintiff and destroy any copies. Defendant's letter states that the only documents that it has in its possession are "The Three Bears" presentation and opinion letters. Defendant advised plaintiff to contact defendant if it believed defendant had any additional material alleged to be confidential. Gray admitted at his deposition that plaintiff never contacted defendant to advise defendant that it believed defendant had any other confidential documents or other proprietary information from plaintiff. After termination of the Agreement, defendant instructed all of its employees to destroy any of plaintiff's materials in their possession.

Gray has created a series of memorandums and letters describing plaintiff's Leveraged Life Insurance programs, which plaintiff alleges that defendant plagiarized. This court held an evidentiary hearing on plaintiff's motion for a preliminary injunction regarding defendant's marketing of certain insurance programs, and denied the motion at the conclusion of the hearing. Gray testified at the preliminary injunction hearing that a document listed as the "leverage overview memorandum" in Schedule A to the Agreement, is also referred to by plaintiff as the "gift compression techniques" letter or memorandum ("GCT memo"). Defendant asserts that it never saw or received the GCT memo, or any document with the text of the GCT memo. According to plaintiff, the GCT memo is a general explanation of plaintiff's program, and it was

5

always confidential. Gray further testified at the preliminary injunction hearing that before the GCT memo is disclosed, plaintiff requires a potential licensee to sign a confidentiality agreement. When asked by this court whether the GCT memo was disclosed in some circumstances without the recipient signing a confidentiality agreement, Gray testified, "Occasionally went to an advisor."

After the denial of plaintiff's preliminary injunction motion, defendant filed a counterclaim and discovery followed. During discovery, plaintiff produced evidence of 190 confidentiality agreements. Defendant attached to its L.R. 56.1 statement a compilation of GCT memos that were disseminated by Gray to over 29 persons without confidentiality agreements. Only one of those letters, addressed to David Evans and dated December 4, 2001, was copyrighted. During discovery, several motions for sanctions were filed by both parties, including a motion by defendant for sanctions based on plaintiff's failure to turn over un-redacted copies of the GCT memo. Plaintiff's continued failure to produce documents burdened defendant and the court system with a protracted discovery dispute that required two hearings before Magistrate Judge Brown and multiple rulings by this court and Magistrate Judge Brown. See Tax Track Systems Corp. v. New Investor World, Inc., case no. 01 C 6217 (N.D. Ill. Feb. 18, 2003) (order overruling objections to orders entered by Magistrate Judge Brown); Tax Track Systems Corp. v. New Investor World, Inc., 2002 WL 31499208 (N.D. Ill. Nov. 6, 2002) (Brown, M.J.); Tax Track Systems Corp. v. New Investor World, Inc., 2002 WL 31473818 (N.D. Ill. Nov. 4, 2002) (Brown, M.J.). Gray testified at the second hearing before Magistrate Judge Brown that since it was originally created in 1996, the GCT memo had been modified several times. Gray testified that over the course of approximately five years he had sent approximately

6

600 or 700 copies of the GCT memo to various individuals. According to Gray, some of the

recipients signed confidentiality agreements, while others did not. Gray further testified that he

did not keep track of the recipients of the GCT memo, and that it would be impossible for him to

identify all of the persons to whom he sent some version of the GCT memo. Magistrate Judge

Brown found that Gray's deposition testimony about the GCT memo was "evasive and

incomplete" and necessitated defendant's filing its third motion for sanctions, and awarded

sanctions against plaintiff. Tax Track, 2002 WL 31473818, at *12.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and

affidavits show there is no genuine issue of material fact and the movant is entitled to judgment

as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);

Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving

party has met its burden, the nonmoving party must go beyond the pleadings and set forth

specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v.

Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the

record as a whole and draws all reasonable inferences in the light most favorable to the party

opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th

Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc, 477 U.S. 242,

248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). However, the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## DISCUSSION

### I.      Breach of confidentiality agreement (Count I)

In Count I of its second amended complaint, plaintiff alleges that defendant breached the Agreement by disclosing, using, and failing to return the Licensed Material and plaintiff's confidential information.[2]  The Agreement defines Licensed Material as "any and all information listed in Schedule A appended hereto, and any additional material developed over the course of this Agreement to facilitate the concept of Leveraged Life Insurance and the Licensed Material." Schedule A lists three memoranda, including the "Leverage Overview," but does not list the GCT memo.  Defendant argues that the GCT memo and the concept that it discusses were not and are not protectible confidential information, and therefore cannot form the basis of a breach of contract claim.

Choice of law

Plaintiff argues that Texas law should apply to its breach of contract claim in spite of paragraph 11 of the Agreement, which states that Illinois law shall apply.  Plaintiff asserts in its response to defendant's motion for summary judgment that the contractual choice of law provision is invalid because there is no relationship between Illinois and the lawsuit or the parties.  The very next paragraph of plaintiff's brief, however, defeats its own argument.

---

[2] Count I also alleges that defendant failed to develop or allow plaintiff access to defendant's e-marketplace software capabilities, but plaintiff has presented no evidence of this.

8

Plaintiff states that regarding its contract claims, "there is no apparent conflict between Illinois and Texas law." The Seventh Circuit has noted that a court's threshold determination in a choice of law dispute is whether it confronts "'real' rather than 'apparent' conflicts between the laws to be applied." In re Air Crash Disaster Near Chicago, Illinois, 644 F.2d 594, 605 (7th Cir. 1981). "A choice of law determination need not be made 'unless there is an actual conflict in the substantive law such that the case would have a different outcome depending on which law is applied.'" V &V Supremo Foods, Inc. v. Sloan Acquisition Corp., 2002 WL 1759787, at *3 (N.D. Ill. July 29, 2002)(citations omitted). Accordingly, Illinois law applies to plaintiff's breach of contract claim pursuant to the choice of law provision in the Agreement.

Protectible information

Non-disclosure or confidentiality agreements are considered restrictive covenants under Illinois law, and must be carefully scrutinized as at least partial restraints of trade. Archer Daniels Midland Co. v. Whitacre, 60 F. Supp. 2d 819, 825 (C.D. Ill. 1999)(citing Label Printers v. Pflug, 206 Ill. App. 3d 483, 491 (2nd Dist. 1991)). A restrictive covenant can be enforced only if the evidence shows that the confidential information sought to be protected is, in fact, confidential. Id. (citing Curtis 1000, Inc. v. Suess, 24 F.3d 941, 947 (7th Cir. 1994)). In the instant case, because plaintiff has abandoned its trade secret claims, this is a case about disclosure of confidential information, not trade secrets. A plaintiff seeking to enforce restrictions on the disclosure of confidential information need not establish that the information rises to the level of a trade secret, CUNA Mutual Life Ins. Co. v. Kuperman, 1998 WL 409880, at *7 (N.D. Ill. July 7, 1998), but must still demonstrate that it made an "effort to keep such information confidential." Curtis 1000, 24 F.3d at 948.

9

Information will not be considered confidential where a party "claiming a protectable interest did not think enough of it to expend resources on trying to prevent lawful appropriation of it." Id. at 947; CUNA, 1998 WL 409880, at *7. As the Seventh Circuit noted in Curtis 1000, a plaintiff's failure to protect its interest is evidence that "it is not an especially valuable interest ...and that the firm may be trying to dampen competition rather then to protect a legitimate interest." 24 F.3d at 947-48 (citing Rockwell Graphic Systems, Inc. v. DEV Industries, Inc., 925 F.2d 174, 179 (7th Cir. 1991)). In the instant case, the question is whether triable issues of fact exist whether the claimed confidential information was sufficiently secret to derive economic value and whether plaintiff sufficiently sought to protect the information.

Defendant argues that the information plaintiff seeks to protect - the concept plaintiff calls Leveraged Life Insurance - is not unique to plaintiff, and that financed life insurance is widely known in the insurance industry. In support of its argument, defendant notes that Krueger and Greene had been marketing the concept of financed life insurance since at least July 1999, without any confidentiality agreement and before Krueger met Gray or the Agreement was executed. Defendant also submitted the affidavit testimony of eight non-party witnesses who attest to the fact that the concept of financing insurance premiums with the deferral of interest is within the public domain and has been since as early as the 1960s. For example, Charles Boswell ("Boswell"), head of the World Financial Group business unit at WRL, testified at his deposition that he has been aware of the premium finance concept since the 1970s, and named several companies that were developing their own programs prior to 1999. Similarly, Gray admitted at his deposition that AI Credit Corporation had closed cases involving premium financing of life insurance prior to being approached by Gray in 1997.

Defendant also provided the court with a copy of an article from the May 27, 2002, issue of *Investment News,* an insurance trade publication. The article, titled "Premium-Financing For Estates A Hot Commodity," discusses the concept of premium financed life insurance in detail, references multiple insurers and financial institutions involved in the concept, and explains the current high demand for financed life insurance. The first paragraph of the article notes that, "Premium-financing for life insurance isn't a new concept." Lastly, the language of the Agreement also supports defendant's argument that plaintiff's concept is not unique because it appears to contemplate that others have developed and offer a similar financed life insurance program, which defendant agreed to exclude from its portfolio for the duration of the Agreement. Specifically, the section of the Agreement titled "Exclusivity" states, "[Plaintiff] agrees that this program is an exclusive program and that no similar programs to Premium Finance (Leveraged Life Insurance) will be included as part of its product portfolio without the prior consent of [defendant] for the duration of the contract."

Plaintiff argues that it made certain adjustments to the basic concept of financed life insurance that make plaintiff's Leveraged Life Insurance sufficiently unique. Indeed, some of defendant's witness testified that a company's combination of different insurance products and loan facilities is what makes a company's financed life insurance programs unique, and conceded that plaintiff's program contained some elements that may be unique. Even if plaintiff made sufficient adjustments to the widely-shared concept of financed life insurance to derive an economic value, however, plaintiff fails to meet the second requirement of protectable information because it failed to undertake reasonable efforts to prevent its concept from falling into the hands of competitors. See Thermodyne Food Service Products, Inc. v. McDonald's

11

Corp., 940 F. Supp. 1300, 1306-07 (N.D. Ill. 1996)("For if the owner failed to undertake reasonable efforts to prevent the trade secret from falling into the hands of competitors, the law will not provide the owner a remedy; in essence, the owner will be deemed to have abandoned the trade secret.")

During this court's ruling denying plaintiff's motion for a preliminary injunction, the court noted that it was "not convinced at all that there is a protectable interest here." Subsequently, Gray admitted during a hearing on sanctions before Magistrate Judge Brown that the documents that he claimed were stolen were in fact widely distributed to prospective clients and others. Plaintiff argues that it "initially...took significant steps to insure the secrecy of its program," that it "customarily" requires those intending to pursue an interest in promoting plaintiff's program to sign a confidentiality agreement, and that if written agreements are not possible, plaintiff obtains "at least some commitment that the information will be held in confidence." Plaintiff admits, however, that it sent out over 600 or 700 GCT memos but presents evidence of fewer than 200 confidentiality agreements.

Of course, the mere fact that a plaintiff gave the claimed confidential information to "a limited number of outsiders for a particular purpose does not forfeit protection." Rockwell Graphic Systems, Inc. v. DEV Industries, Inc., 925 F.2d 174, 177 (7th Cir. 1991). The Seventh Circuit noted in Rockwell that some disclosure is often necessary to the efficient exploitation of a trade secret. Id. The same reasoning applies to confidential information, which a company may likewise share with others in an attempt to secure more business. The Rockwell court also noted, however, that if a plaintiff expends only paltry resources on protecting its information and has allowed it to fall into the public domain, "he would enjoy a windfall if permitted to recover

12

damages merely because the defendant took the secret from him, rather than from the public domain as it could have done with impunity." Id. at 179(citations omitted).

Plaintiff argues that it maintained the confidentiality of the Leveraged Life Insurance concept. In support of its argument, plaintiff cites Metallurgical Industries Inc. v. Fourtek, Inc, 790 F.2d 1195 (5th Cir. 1986), a misappropriation of trade secrets case in which the court noted that "[a]lthough the law requires some secrecy, it need not be absolute." In Mettalurgical, the plaintiff had not destroyed the secrecy of its manufacturing process by sharing it with two potential business partners with which it was dealing prior to the alleged misappropriation. The instant case, however, is easily distinguishable because the undisputed facts here establish that plaintiff's dissemination outpaced the plaintiff in Metallurgical by a factor of several hundred. That is, plaintiff does not dispute that it disseminated 600 to 700 copies of the GCT memo, which Gray characterizes as explaining the entire concept Leveraged Life Insurance. Gray also admits that he discussed Leveraged Life Insurance with scores of others, often without the protection of a confidentiality agreement. This is a far cry from the two businesses with whom the plaintiff shared its concept in Metallurgical, and is analogous to the"paltry" efforts deemed insufficient to maintain confidentiality by the Seventh Circuit in Rockwell. Even taking all the facts in the light most favorable to the party opposing summary judgment and drawing all inferences in that party's favor, as the court must, plaintiff in the instant case has failed to raise a triable issue of fact whether it took reasonable precautions to keep the claimed confidential information confidential.

Plaintiff has thus failed to create a triable issue of fact that the information he seeks to protect was protectable, as required to survive summary judgment on a claim for breach of a non-

disclosure agreement. Accordingly, the court need not reach defendant's other arguments regarding irreparable harm. Defendant's motion for summary judgment is granted as to Count I.

## II. Tortious interference with prospective economic advantage (Count II)

In Count II of its second amended complaint, plaintiff alleges that defendant interfered with its prospective business relationships for estate planning services by breaching the Agreement and misappropriating plaintiff's confidential information.

Although neither party states the law, to establish tortious interference with prospective economic advantage, plaintiff must demonstrate: (1) plaintiff's reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of plaintiff's expectancy; (3) intentional and unjustified interference by defendant that caused a termination of plaintiff's legitimate expectancy; and (4) damages to plaintiff from the interference. Heavenly Ham Co. v. HBH Franchise Co., LLC, 2005 WL 331558, at *16 (N.D. Ill. Feb. 7, 2005); See Voyles v. Sandia Mort. Corp, 196 Ill.2d 288, 300-01 (2001).

Defendant argues that plaintiff fails to offer any evidence of the fourth element of tortious interference because he does not identify any expected business relationships that were damaged by the alleged misappropriation or breach of the Agreement. One of defendant's interrogatories sought the identity of anyone with whom plaintiff alleges that it expected to enter into a business relationship which was not consummated because of the defendant's allegedly tortious conduct. Plaintiff responded, "None at Present." Plaintiff's brief in opposition to the motion for summary judgment points to no evidence in the record that plaintiff had any expected business relationships with which defendant allegedly interfered. Plaintiff's argument that there are disputed issues of fact whether defendant has closed any financed life insurance cases since 2000

14

misses the mark, because the question for a tortious interference claim is the plaintiff's expectations. Moreover, plaintiff's assertion, which defendant does not dispute, that defendant has not closed any cases to date further weakens plaintiff's argument that he was damaged by defendant's alleged tortious interference, because it appears that neither party has profited from the concept.

To defeat a motion for summary judgment, the non-moving party must "set forth specific facts showing a genuine issue for trial exists," Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669 (7th Cir. 2000), and "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." Serfecz v. Jewel Food Stores, 67 F.3d 591, 596 (7th Cir. 1995). Plaintiff's failure to offer any evidence of an expected business relationship with which defendant allegedly interfered is fatal to its tortious interference claim. Accordingly, the court grants defendant's motion for summary judgment as to Count II.

**III. Common law misappropriation (Count III) and quantum meruit (Count IV)**

Choice of Law

Plaintiff argues that even though Illinois law applies to its breach of contract claim, Texas law should apply to its common law claims of misappropriation and quantum meruit. As discussed above, plaintiff generally asserts that the contractual choice of law provision in the Agreement should not apply because there is no relationship between the parties and Illinois

law.[3]  Although plaintiff does not explicitly argue this, it appears that it believes there is a

conflict between Illinois and Texas law regarding its common law claims.  Defendant argues that

Illinois law also applies to plaintiff's common law claims because defendant's alleged tortious

conduct is based upon the same operative facts as plaintiff's breach of contract claim, to which

Illinois law applies.

Courts have repeatedly held that contractual choice of law provisions apply to torts that

are closely related to the parties' contractual relationship.  See, e.g., Kinesoft Dev. Corp. v.

Softbank Holdings, 139 F. Supp. 2d 869, 905 (N.D. Ill. 2001)(tortious interference claim subject

to provision of contract stating that it shall be construed in accordance with Illinois law)(citing

First Commodity Traders, Inc. v. Heinold Commodities, Inc., 591 F. Supp. 812, 815 (N.D. Ill.

1984)(contractual choice of law provision requiring interpretation and construction of contract in

accordance with Illinois law also controlled unjust enrichment and tortious interference claims

"since they are closely related to the parties' contractual claims.")).  Defendant in the instant case

argues that because plaintiff abandoned its trade secret claims, "any claimed legal duty relating to

confidentiality must by necessity arise out of the parties' contract and be governed by Illinois

law."  Even though plaintiff notes that if Illinois law applies some of its claims may be

preempted by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 et seq., plaintiff fails to

respond to defendant's choice of law argument regarding the common law claims as distinct

---

[3]Plaintiff also makes the cursory statement that defendant is estopped from claiming that
Illinois law applies when it "previously asserted" that Texas law applied.  Plaintiff does not
specify where defendant made this alleged assertion.  Defendant concedes that it initially
suggested in its Fed. R. Civ. P. 12(b)(6) motion that Texas law should apply to any alleged
tortious conduct in Texas, but that discovery failed to reveal any evidence of such conduct.
Defendant is therefore not estopped from arguing that Illinois law applies.

from the breach of contract claim and merely relies on its general argument that the contractual choice of law provision should not be enforced.

The operative allegations of Count III are explicitly based on defendant's alleged misappropriation in violation of the Agreement. In particular, paragraph 30 of the second amended complaint states that defendant is guilty of common law misappropriation because it "misappropriated the Licensed Material and other confidential information by breaching the [Agreement], disclosing the Licensed Material and other confidential information to third parties and using the Licensed Material and other confidential information in competition with [plaintiff]." Similarly, the operative allegations of Count IV are based on the terms of the Agreement and defendant's alleged misappropriation of confidential information. Because plaintiff has failed to address defendant's choice of law argument regarding the common law claims, and defendant's argument appears meritorious, the court applies Illinois law to the common law claims.

Under Illinois law, plaintiff's common law theories are preempted by ITSA Under section 8 of ITSA, non-contract causes of action are preempted to the extent that they are based on a misappropriation of trade secrets. Master Tech Products, Inc. v. Prism Enterprises, Inc., 2002 WL 475192, at *2 (N.D. Ill. Mar. 27, 2002). Specifically, section 8 states, "Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing misappropriation of a trade secret." The Seventh Circuit has noted that with the passage of ITSA, "Illinois...abolished all common law theories of misuse of [secret] information." Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992.). That is, ITSA was meant to "codify all the various

common law remedies for theft of ideas." Learning Curve Toys, L.P. v. Playwood Toys, 1999 WL 529572, at *3 (N.D. Ill. July 20, 1999)(collecting cases). These cases suggest that ITSA preempts non-contract claims based on misappropriation of confidential information, as well as trade secrets.

Plaintiff's response to defendant's motion for summary judgment on its misappropriation claim is only a paragraph long, and merely cites the elements of common law misappropriation under Texas law. Plaintiff does not even attempt to apply this statement of the law from another state to the facts of the instant case. Even more egregiously, plaintiff fails to address defendant's motion for summary judgment on its quantum meruit claim at all. Defendant argues that the misappropriation and quantum meruit claims merely recast plaintiff's breach of contract claim. As the Learning Curve Toys court noted, "if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois." Id. at *3.

Because plaintiff fails to properly argue that Counts III and IV should survive summary judgment and because defendant's argument that plaintiff's common law claims are preempted under ITSA appears meritorious, the court grants defendant's motion for summary judgment as to Counts III and IV.

## IV.    Defendant's counterclaims

Defendant has filed a two-count counterclaim against plaintiff, alleging breach of contract (Count I) and fraudulent misrepresentation (Count II). Pursuant to Fed. R. Civ. P. 56, plaintiff has filed a motion for summary judgment on both counterclaims. For the reasons discussed

herein, the court grants plaintiff's motion for summary judgment as to Counts I and II of defendant's counterclaim.

Plaintiff argues that it is entitled to summary judgment on Count I of defendant's counterclaim because defendant breached the notice and cure provision of the Agreement.[4] Defendant terminated the three-year contract after approximately three months. Defendant states in its termination letter that "under paragraph 6 of our contract [defendant] is hereby serving notice of its desire to terminate the contract." Paragraph 6 of the Agreement provides for termination of the Agreement by either party, with or without cause, upon 90 days notice to the breaching party. Regarding commissions pursuant to the Agreement, the termination letter states that, "Clearly anything that is about to close, (nothing has yet) or closes within 90 days of this letter will be covered." Defendant explicitly terminated the Agreement pursuant to paragraph 6, which does not contain a notice and cure provision, and agreed to continue the terms of the Agreement until that date. Defendant therefore did not breach the Agreement by terminating it without abiding by the notice and cure requirement.

Defendant argues that plaintiff breached the Agreement by, inter alia, failing to provide certain documents listed in Schedule A of the Agreement. The Agreement states that plaintiff will give defendant "access to and rights to use...certain confidential and proprietary information, business methods and practices as have been developed over time by Tax Track ("Licensed Material")." The Agreement defines "Licensed Material" to include "any and all information

---

[4]The court notes that although plaintiff fails to point to a specific portion of the Agreement, the notice and cure provision is contained in third paragraph of the recitation section. It states that, "Either party can terminate the contract in the event of the other not fulfilling their [sic] commitments," upon notice and thirty days to cure.

listed in Schedule A," which lists documents including opinion letters, several memoranda including "Leverage Overview," and "methodologies learned re sales process, and order processing." The court agrees with defendant that the plain language of the contract contemplates that plaintiff was obligated to provide these materials to defendant, and plaintiff does not dispute that at the time of its termination it had provided only the opinion letters. The Agreement, however, does not specify a time period or deadline for production of these documents. Defendant presents no argument or evidence that plaintiff was obligated to produce the documents listed in Schedule A within the first three months of the Agreement.

Similarly, defendant also alleges that plaintiff breached the Agreement because plaintiff had a contractual duty under Schedule B to the Agreement[5] to have lenders in place to issue the necessary loans. Schedule B is titled "Division of Responsibilities," and lists the respective responsibilities of plaintiff and defendant. It states that one of plaintiff's duties is to "[a]rrange lending relationships with sufficient terms and capacity necessary to accommodate the NIW representatives and Western Reserve Life field force." Plaintiff argues that it was not obligated under the Agreement to have lenders in place who were willing to issue the necessary loans, and that it was not given a chance to perform its contractual duties because defendant terminated the three-year Agreement after only three months. Again, as with Schedule A, defendant does not explain how the language of Schedule B, absent a due date or deadline, obligated plaintiff to produce willing lenders within the first three months of the Agreement.

---

[5]The court notes that contrary to defendant's assertion in its counterclaim that Schedule B was attached to plaintiff's first amended complaint, it was not attached to the copy filed with the court. Schedule B was also not attached to plaintiff's second amended complaint, or even to defendant's counterclaim. Through a search of the voluminous record of this case, the court was able to locate a copy of Schedule B attached to plaintiff's motion for a protective order.

For the reasons stated above, defendant has failed to create a triable issue of fact whether plaintiff breached the Agreement. Accordingly, the court grants plaintiff's motion for summary judgment as to Count I of defendant's counterclaim.

Count II of defendant's counterclaim alleges that plaintiff fraudulently misrepresented that it had established relationships with lenders that were willing and able to issue long-term loans to finance the premium payments and the accrued interest on the life insurance policies. Defendant also alleges that Gray misrepresented himself as an attorney. Plaintiff argues that it is entitled to summary judgment on Count II of defendant's counterclaim because defendant fails to offer evidence from which a jury could reasonably find that defendant was damaged by plaintiff's alleged misrepresentations. Plaintiff also argues that it did not misrepresent that Gray was an attorney, and even if it had made such a representation, it was not material.

In Illinois, a plaintiff (or counter-plaintiff) must prove five elements to succeed on a claim for fraudulent misrepresentation: (1) a false statement of material fact; (2) knowledge or belief of the falsity by the party making it; (3) the intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such a reliance. Connick v. Suzuki Motor Co., 174 Ill.2d 482, 496 (1996). In the instant case, plaintiff argues that defendant has failed to offer evidence of several required elements, including that it was damaged by plaintiff's alleged misrepresentations.

Defendant alleges that it suffered three types of damages: (1) damages for losing three cases because it was unable to secure the necessary loans; (2) travel costs of $13,065.20 for travel while seeking lenders; and (3) "lost income, lost profit, loss of business, loss of goodwill, expenses incurred in creating its own marketing materials, and expenses incurred in securing

21

appropriate lenders," which defendant estimates at $1.3 million. Defendant, however, has failed to provide any evidence in support of these damage claims, other than a bare statement of the alleged damage amounts in its Fed. R. Civ. P. 26(a)(1) disclosures, and conclusory statements in its brief. Contrary to defendant's assertion in its response to plaintiff's motion for summary judgment, there is no supporting documentation attached to defendant's Rule 26(a)(1) disclosure[6], and defendant has not provided the court with any documentation or pointed the court to any other evidence supporting its claimed damages.

"It is not [the court's] function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies." Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996)(citations omitted). To defeat a motion for summary judgment, the non-moving party must "set forth specific facts showing a genuine issue for trial exists," Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669 (7th Cir. 2000), and "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." Serfecz v. Jewel Food Stores, 67 F.3d 591, 596 (7th Cir. 1995). Defendant in the instant case has failed to provide any evidence other than speculation and conclusory statements that it suffered tangible or intangible damages from the alleged misrepresentations, which is a required element of a fraudulent misrepresentation claim. Accordingly, the court grants plaintiff's motion for summary judgment as to Count II of defendant's counterclaim.

---

[6]Defendant lists its alleged damages in paragraph C of its Rule 26(a)(1) statement and states, "See also documents produced in response to paragraph C of this disclosure." Defendant did not provide the court with a copy of its Rule 26(a)(1) statement, and the copy attached to plaintiff's L.R. 56.1 statement does not have any documents attached.

## CONCLUSION

For the reasons stated herein, the court grants defendant's motion for summary judgment as to Count I (breach of contract), Count II (tortious interference), Count III (common law misappropriation), and Count IV (quantum meruit) of plaintiff's second amended complaint. The court grants plaintiff's motion for summary judgment as to Count I (breach of contract) and Count II (fraudulent misrepresentation) of defendant's counterclaim.

**ENTER:**     **March 24, 2005**

**Robert W. Gettleman**
**United States District Judge**